# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 09-20133 |
| ) | |
| GLADSTONE McDOWELL, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant Gladstone McDowell's motion to suppress evidence (doc. 288), challenging the validity of a traffic stop conducted by Texas County, Oklahoma police officers on November 14, 2007. As a result of the traffic stop, Mr. McDowell and Marlon Forrester were arrested for transporting $139,980 in cash, an incident included in several of the charges against the two defendants as set forth in the Indictment (doc. 1). Mr. McDowell argues in his motion to suppress that the initial stop, subsequent detention, and search of the vehicle violated his rights under the Fourth Amendment. The Court held hearings on the motion on September 28, 2010 and November 30, 2010 and, after hearing argument on the motion on December 15, 2010, took the matter under advisement. After thoroughly considering the parties' arguments and the evidence, for the reasons set forth below, the Court denies the motion.

**FINDINGS OF FACT**

On November 14, 2007, Agents Chris Bird and Chan Boley were patrolling traffic on U.S. Highway 54 from their separate, marked vehicles stationed at a roadside park in Goodwell, Oklahoma. They observed a maroon Dodge Durango traveling westbound at a low rate of speed and displaying a Missouri license plate of 2AM-04N. Agents Bird and Boley testified that they watched the Durango move from its lane of traffic onto the right-hand shoulder of the highway as if to turn onto Aggie Avenue. The Durango did not signal its intention to change lanes or to turn onto Aggie Avenue. Rather than turning, the Durango continued through the intersection while remaining in the right-hand shoulder. Agent Bird left the roadside park to initiate a traffic stop on the Durango. He positioned his patrol vehicle behind the Durango and observed it driving on the outside white line and then onto the right shoulder for approximately 350 yards. After regaining its lane, the Durango swerved several more times, failing to maintain its lane of travel. Agent Bird activated his emergency lights and pulled over the Durango.

The driver of the Durango, Marlon Forrester, produced a Jamaican driver's license upon Agent Bird's request for license and registration. Agent Bird then asked Mr. Forrester to step out of the Durango and accompany him to the patrol vehicle. Agent Bird explained to Mr. Forrester why the Durango had been stopped and asked if Mr. Forrester had been driving all night. Mr. Forrester confirmed that he had

2

driven all night but stated that he was fine to drive. Agent Bird then informed Mr. Forrester that a warning ticket would be issued for the lane violation. When asked if he owned the Durango, Mr. Forrester answered that the Durango had been rented by his cousin, Gladstone McDowell, a passenger in the vehicle. At this point Agent Bird contacted Agent Boley to request that Agent Boley and his canine come to the scene and screen the Durango for illegal substances. Agent Boley was at the time still stationed at the roadside park, approximately one mile from the traffic stop. Agent Bird returned to the Durango and asked Mr. McDowell if he had rented the Durango. Mr. McDowell said that he had and produced his driver's license and rental agreement. Once back in his patrol vehicle, Agent Bird ran Mr. McDowell's driver's license to check its validity and to search for any warrants.

While Agent Bird was running Mr. McDowell's information and writing the lane violation warning, Agent Boley arrived at the scene with his canine, Brindi, and conducted an open air sniff of the vehicle. Brindi alerted to the driver's side door of the Durango, indicating the odor and/or presence of illegal narcotics. At about this time, Agent Bird completed the process of issuing a warning ticket and returned the driver's licenses to Mr. Forrester. Agent Bird asked Mr. Forrester if he could ask a few additional questions, and Mr. Forrester agreed. When asked if he was transporting anything illegal, Mr. Forrester answered no. Agent Bird then asked if he could search the Durango, to which Mr. Forrester replied that Agent Bird would have to ask his cousin. Agent Bird again returned to the Durango to speak with Mr.

3

McDowell and a second passenger, Francis Pryor. Mr. McDowell and Ms. Pryor both agreed to answer Agent Bird's questions. They denied transporting any illegal drugs, weapons, or large amounts of cash. When Agent Bird asked if he could search the Durango, Mr. McDowell declined the request.

After McDowell refused consent to a search of the Durango, Agent Boley told Mr. McDowell and Ms. Pryor that his police canine had alerted to the presence of illegal narcotics in the Durango. He explained that the canine would alert to narcotics whether present in large quantities or residual amounts and asked Mr. McDowell and Ms. Pryor whether they had recently been in the proximity of, or used, any illegal narcotics. Mr. McDowell and Ms. Pryor answered no, but Ms. Pryor said she had recently smoked a cigarette. Agent Boley explained that his canine was trained only to alert to the presence of cocaine, heroine, methamphetamine, or marijuana. He told Mr. McDowell and Ms. Pryor that because his canine had alerted to the presence of one of these illegal narcotics, he had probable cause to search the Durango. Mr. McDowell and Ms. Pryor were placed in the patrol vehicle while the search was conducted.

Upon searching the Durango, Agents Bird and Boley found a brown luggage bag. Inside the luggage bag was a Nordstrom bag, containing two trash bags. The trash bags contained $139,980 of United States currency. Mr. McDowell, Mr. Forrester, and Ms. Pryor were then held in investigative detention.

**ANALYSIS**

4

Mr. McDowell argues that both the initial stop of the Durango and any subsequent detention were unreasonable. He further argues that Agent Bird and Agent Boley had no probable cause to justify searching the car, because the canine used to screen the vehicle was unreliable. Mr. McDowell, as the moving party, bears the burden of proving that the challenged seizure and search were unlawful. *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004).

**I. Traffic Stop**

A traffic stop is a seizure for purposes of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Traffic stops are analyzed under the "reasonable suspicion" rubric set out in *Terry v. Ohio*, 392 U.S. 1, 27 (1968). *See United States v. Bravo*, 306 F. App'x 436, 439 (10th Cir. 2009). The first inquiry under *Terry* is whether the stop was justified at its inception. *Id*. "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). An individual officer's subjective motivations for making a traffic stop are irrelevant to the Fourth Amendment inquiry. *United States v. Burkley*, 513 F.3d 1183, 1186 (10th Cir. 2008).

In this case, the traffic stop was justified at its inception. Both Agent Bird and Agent Boley testified that they observed the Durango fail to maintain a single lane of

5

travel and watched it change lanes without signaling. Agent Bird, upon following the Durango, witnessed it continue to cross over the outside white line and fail to maintain its lane of travel. The Agents thus had reasonable suspicion to believe a traffic violation had occurred, specifically a failure to comply with Title 47 of the Oklahoma Statute, Sections 11-309(1) and (2). Section 11-309 of the Oklahoma statute states in relevant part:

> (1) A vehicle shall be driven as nearly as practicable entirely within a single lane.
>
> (2) A vehicle shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety and then given a signal, not less than the last one hundred (100) feet traveled by the vehicle, of his intention to change lanes.

Okla. Stat. Ann. tit. 47, §§ 11-309(1) and (2) (West 2007).[1] Mr. Forrester later corroborated the Agents' testimony concerning his erratic driving. After stopping the Durango, Agent Bird asked Mr. Forrester if Mr. Forrester had been driving all night, offering a possible explanation for his irregular driving. Mr. Forrester confirmed Agent Bird's speculation.

The observations made by Agent Bird and Agent Boley were sufficient to stop the Durango. The Court does not look beyond the observed traffic violation to the subjective intent of the officer in order to determine whether the traffic stop was a

---

[1] Courts have found similar violations under Oklahoma Statute Annotated § 11-309 to warrant lawful traffic stops. *See, e.g.*, *United States v. Bravo*, 306 F. App'x 436 (10th Cir. 2009); *United States v. Garcia*, 87 F. App'x 707 (10th Cir. 2004); *United States v. De La Fuente-Ramos*, 2000 WL 1717186 (10th Cir. 2000); *Tripp v. Oklahoma*, 117 P.3d 226 (Okla. Civ. App. 2005).

6

"pretext" for pursuing some other investigatory purpose. *See Whren v. United States*, 517 U.S. 806, 809-16 (1996).

The second *Terry* inquiry is whether the officers' conduct during the detention was reasonably related in scope to the circumstances which justified the initial stop. *See United States v. Williams*, 403 F.3d, 1203, 1206 (10th Cir. 2005). Once an officer resolves the concern that justified the initial stop, any continued detention must be supported by a reasonable suspicion of criminal activity. *United States v. Alarcon-Gonzalez*, 73 F.3d 289, 292 (10th Cir. 1996). A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

Here, the issue is whether detention prior to the canine alert was reasonable, applying common sense and ordinary experience. *See United States v. Paterson*, 472 F.3d 767, 777 (10th Cir. 2006). Agent Bird detained and questioned Mr. Forrester for approximately eight minutes, during which time Agent Bird checked Mr. McDowell's license and rental agreement and prepared a warning ticket for the lane violations. "An officer conducting a traffic stop may request vehicle registration and a driver's license, run a computer check, ask about travel plans, vehicle ownership, and issue a citation." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001). There is no indication that Agent Bird extended questioning in an effort to prolong the stop to give Agent Boley time to arrive at the scene with the canine.

Rather, the tape of the traffic stop (Gov't. Exh. 1) indicates that Agent Boley arrived at the scene and conducted a canine sweep of the Durango while Agent Bird was still discussing the traffic stop with Mr. Forrester and conducting routine work pertaining to issuing a warning. Agent Boley and his canine completed the open air sniff of the Durango before Agent Bird finished writing the warning ticket or returned the licenses to Mr. Forrester. Accordingly, the Court finds that the vehicle was only detained for as long as necessary to perform the traditional incidents of a routine traffic stop. *See United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007).

**II. Search of the Vehicle**

The Fourth Amendment does not require reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop. *United States v. Castaneda*, 2010 WL 653575, at *3 (10th Cir. Feb. 25, 2010) (citing *Illinois v. Caballes*, 543 U.S. 405, 410 (2005)). A canine sniff on the exterior of a vehicle during a lawful traffic stop does not implicate legitimate privacy interests. *Williams*, 403 F.3d at 1207. Here, the canine sniff was performed on the exterior of the Durango while Mr. McDowell and Mr. Forrester were lawfully seized for a traffic violation, and therefore, Agent Bird and Agent Boley did not need reasonable suspicion to conduct the sweep. *See Caballes*, 543 U.S. at 409. Any intrusion on the privacy of Mr. McDowell and Mr. Forrester did not rise to the level of a constitutionally cognizable infringement. *See id.*

During the canine sniff, Brindi alerted to the presence of illegal narcotics at the

driver's side door of the Durango by making what Agent Boley understood to be a "final sit" at the door. The canine alert gave rise to probable cause for the Agents to search the vehicle. *See id.* While Agent Bird and Agent Boley first asked Mr. Forrester and Mr. McDowell for permission to search the Durango, they were not required to do so. The Agents testified that they asked for the passengers' consent to search the vehicle as part of their normal practice but were aware that probable cause was established once the canine alerted to the presence of illegal narcotics.

Mr. McDowell contends that even if a canine alert normally constitutes probable cause to search a vehicle, it should not in this case, because the canine conducting the sniff was unreliable. It is firmly established that alerts by reliable drug-detection dogs provide probable cause to conduct a search. *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997). A drug-detection dog's reliability is primarily established by the dog's training and certification. *Id*. at 1378; *United States v. Betram*, 307 F. App'x 214, 215 (10th Cir. 2009). As the party seeking to suppress the evidence, Mr. McDowell has the burden of proving the dog was unqualified. *United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009).

At the September 28, 2010 hearing, Mr. McDowell suggested that even though Agent Boley and Brindi are a trained and certified drug-detection team, Brindi is nevertheless unreliable because of her imperfect accuracy record. A dog alert might not give probable cause if the particular dog has a poor accuracy record. *United States v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir. 1993). Mr. McDowell introduced

9

records of Brindi's drug-detection activity as evidence of Brindi's history of erroneous alerts. Several entries indicated that Brindi alerted to the presence of illegal narcotics where no narcotics were subsequently found. Agent Boley later explained, however, that drug-detection canines can detect residual amounts of narcotics. The dogs will therefore alert in situations where passengers had been in the presence of illegal narcotics or where narcotics had at some time been used in or around the vehicle. Agent Boley's written comments on Brindi's activity records show that in situations where Brindi alerted and no drugs were found, passengers of the vehicle usually admitted that drugs were used at one time in or around the vehicle. The concerns raised by Mr. McDowell were further dispelled during Juston Hutchinson's testimony at the November 30, 2010 hearing when Mr. Hutchinson confirmed that Brindi was trained to alert to residual amounts of drugs. According to Mr. Hutchinson, currency contaminated with drugs holds residual amounts of the drugs in a quantity sufficient to alert a canine, as compared to regular circulating currency that may carry minute traces of drugs. The Court is therefore not convinced that Brindi's records reflect that she is inaccurate or unreliable in drug-detection.

Mr. Mcdowell introduced at the November 30, 2010 hearing the expert testimony of a professional dog trainer, Steven Nicely, who stated that after reviewing the videotape of the car stop and canine sniff, he believed Brindi's alert untrustworthy. According to Mr. Nicely, it seemed from the videotape that Agent Boley cued Brindi to alert at the driver's side door of the Durango by jerking the

10

leash. While the Court recognizes that Mr. Nicely has considerable experience training dogs, the Court does not find Mr. Nicely's testimony persuasive. Mr. Nicely vehemently endorses the behavioral science approach to dog training, a theory that Mr. Nicely concedes is not widely recognized in the dog training world. His overall testimony was that Brindi's training was insufficient under behavioral science standards. However, Mr. Nicely is not familiar with the training and certification processes used in the state of Oklahoma, other than understanding that the state has not adopted the behavioral science method. Mr. Nicely himself has never been certified as a dog handler or trainer. More importantly, Mr. Nicely is not aware of the specifics regarding Brindi's training, nor has he observed Brindi during training or in the field. Mr. Nicely reviewed records regarding Brindi's training and certification, but acknowledged during his testimony that not much could be gleaned from the records alone.

On the other hand, the government presented evidence that Agent Boley and Brindi began training in May 2007 and have been annually certified as a team since September 2007. Prior to being assigned to Agent Boley as her handler, Brindi was personally selected and trained by Juston Hutchinson. Mr. Hutchinson testified at the November 30, 2010 hearing that he has owned and operated a dog training facility since 1997 and, prior to opening his training facility, he was a police officer in Oklahoma. Mr. Hutchinson is certified to train and certify handlers and their dogs, and he also teaches courses to dog training instructors. To receive certification from

Mr. Hutchinson's training academy, a handler and dog must meet standards that surpass the state requirements of Oklahoma. According to Mr. Hutchinson, Brindi is a capable and accurate drug detection dog. From reviewing the videotape, Mr. Hutchinson testified that Brindi independently alerted to the presence of narcotics at the driver's side door of the Durango. Mr. Hutchinson explained that at no point did Agent Boley create tension on the leash, and therefore, Agent Boley did not cause Brindi to alert or sit. In sum, the Court finds no basis to support Mr. Nicely's theory that Agent Boley prompted Brindi to alert and sit during the sweep of the Durango or that Brindi was not properly trained to be an effective drug-detection canine.

The Court is convinced that Brindi's training and certification records, along with the testimony of Agent Boley and Mr. Hutchinson, establish more than satisfactory proof of Brindi's reliability in detecting narcotics and trustworthiness in the instant case. *See Betram*, 307 F. App'x at 215. Mr. McDowell did not overcome his burden of showing that Brindi is an unreliable drug-detection dog. Therefore, the Court finds that Brindi's alert to the presence of illegal narcotics in the Durango adequately supported probable cause to search the vehicle.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's motion to suppress evidence (doc. 288) is denied.

**IT IS SO ORDERED** this 16th day of December, 2010.

s./ John W. Lungstrum
John W. Lungstrum
United States District Judge